IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20–cv–02092–RMR–MDB

RALPH D. ROUND,[1]

      Plaintiff,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, FOREST SERVICE;
THOMAS VILSACK, United States Secretary of Agriculture;
RANDY MOORE, Chief, United States Forest Service;
FRANK BEUM, Regional Forester, Rocky Mountain Region;
DIANA TRUJILLO, Supervisor, Pike and San Isabel National Forest & Cimarron and Comanche National Grasslands;
JOHN LINN, District Ranger, Comanche National Grasslands;
PATRICIA HESSENFLOW, Range Staff, Comanche National Grasslands;
COLORADO PARKS & WILDLIFE COMMISSION;
STEVE KEEFER, District Wildlife Manager, Colorado Parks & Wildlife District 242;

      Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Magistrate Judge Maritza Dominguez Braswell**

      This matter is before the Court on the Federal Defendants'[2] Motion to Dismiss and the

Colorado Defendants'[3] Motion to Dismiss the Second Amended Complaint. (["Federal

---

[1] On December 27, 2022, Plaintiff's counsel submitted a Notice and Suggestion of Death Upon the Record, informing the Court of Mr. Round's death. Pursuant to Fed. R. Civ. P. 25(a)(1), a motion for substitution must be made "by any party or by the decedent's successor or representative" within 90 days of the notice of death filing. "If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed." Fed. R. Civ. P. 25(a)(1). At the time of this Recommendation, no motion for substitution has been made. The 90 day window to substitute will run on March 27, 2023.

[2] Plaintiff's Second Amended Complaint names the following Federal Defendants: The United States Department of Agriculture, Forest Service; Thomas Vilsack, United States Secretary of Agriculture; Randy Moore, Chief, United States Forest Service; Frank Beum, Regional Forester,

Motion"], Doc. No. 100; ["Colorado Motion," together with the Federal Motion, "Motions"], Doc. No. 101; ["SAC" or "operative Complaint"], Doc. No. 93.) Plaintiff filed a consolidated response to the Motions, and Defendants filed separate replies (["Response"], Doc. No. 110; ["Colorado Reply"], Doc. No. 114; ["Federal Reply"], Doc. No. 115.) For the following reasons, the Court **RECOMMENDS** that the Motions to Dismiss be **GRANTED**.

## STATEMENT OF THE CASE

"This case centers on two livestock grazing allotments contained within the Comanche National Grassland: the Rock Fall Allotment and Crooked Arroyo Allotment."[4] (Doc. No. 89 at 2.) Plaintiff, a cattle rancher permitted to use the Grazing Allotments for the grazing of his cattle,[5] brought the action, "claim[ing] … an ownership interest in the Grazing Allotments resulting from a series of legislative grants to his ancestors in the mid- to late 1800s." (*Id.*) Plaintiff initiated the case seeking to clarify his property interest in the Grazing Allotments and, further, to prevent Defendants from interfering with his alleged ownership rights.

## I.     Procedural Background

The Honorable Regina M. Rodriguez dismissed Plaintiff's First Amended Complaint ["FAC"] without prejudice on December 1, 2021. (Doc. Nos. 66; 89.) In his FAC, Plaintiff

---

Rocky Mountain Region; Diana Trujillo, Supervisor, Pike and San Isabel National Forest & Cimarron and Comanche National Grasslands; John Linn, District Ranger, Comanche National Grasslands; and Patricia Hessenflow, Range Staff, Comanche National Grasslands.

[3] Plaintiff's Second Amended Complaint names the following Colorado Defendants: Colorado Parks & Wildlife Commission and Steve Keefer, District Wildlife Manager, Colorado Parks & Wildlife District 242.

[4] A Grazing Allotment is "a designated area of [U.S. Forest Service] land available for livestock grazing." 36 C.F.R. § 222.1(b).

[5] Plaintiff's ability to use the Grazing Allotments for livestock grazing is based upon a "Grazing Agreement" with the Forest Service. A grazing agreement is a "term grazing permit that can be issued … by the Forest Service" to entities that wish to use federal lands for grazing. (Doc. No. 100, Ex D at 3.)

asserted broad property rights, alleging he was the "surface estate fee-title owner of the Crooked Arroyo and Rock Fall Grazing Allotments" ["Grazing Allotments"], and that the Grazing Allotments "are a fee-title property right of the Plaintiff." (Doc. No. 66 at 2.) Plaintiff alleged that Defendants' actions had interfered with his ownership, led to damage to the Grazing Allotments, and caused the death of some of his cattle. (Doc. No. 89 at 3.) The Federal Defendants disputed Plaintiff's ownership claim and argued that any property rights held by Plaintiff's ancestors "were extinguished when the lands were re-acquired by the United States and included in the National Grasslands." (*Id.*) Judge Rodriguez dismissed the FAC pursuant to Federal Rule of Civil Procedure 12(b)(1), finding that the court lacked subject matter jurisdiction over the suit. Specifically, the court found that because "Plaintiff's action is a quiet title dispute with the United States," the suit must be brought pursuant to the Quite Title Act ["QTA"], "the exclusive means by which a citizen may quiet title against the adverse interest of the United States." (*Id.* at 2.) Plaintiff was granted 60 days to file a second amended complaint. (*Id.* at 11–12.)

## II.   Allegations in Second Amended Complaint

In the SAC, Plaintiff does not bring suit under the QTA. Instead, he narrows his alleged property interests, in what appears to be an attempt to avoid the QTA. Plaintiff no longer claims to be the "fee-title owner" of the Grazing Allotments and instead focuses the SAC on his alleged usage and water usage rights in the Grazing Allotments.

In the SAC, Plaintiff asserts ownership of two wells—located on his private land—from which he transports water into the Grazing Allotments to support his cattle grazing activities. (Doc. No. 93 at 20 ("Plaintiff owns title to at least two groundwater rights, Well Permit No. 25629 and Well Permit No. 287674-A.").) Plaintiff does not claim to own any rights to water

originating in the Grazing Allotments.[6] However, he claims to hold certain usage rights in connection with various "water improvements," constructed on the Grazing Allotments. (*Id.* at 14 (alleging Plaintiff holds "the right to access and protect the water improvements tied to his water rights … within the Grazing Allotments.") "Water improvements" refers to infrastructure such as "springs, water pipelines, and all stock watering 'locations' within the Grazing Allotments." (*Id.*) These improvements facilitate the transport of Plaintiff's groundwater into and throughout the Grazing Allotments and create storage infrastructure from which Plaintiff's livestock can drink.[7] Plaintiff contends that his "water rights and right to access and protect the water improvements" are "valid existing rights" that Defendants may not interfere with, nor allow others to interfere with. (*Id.*); *see* 16 U.S.C. §§ 1600–14.

Plaintiff alleges that the "actions and/or inactions" of Defendants have negatively impacted his ability to deliver "key water supplies" to his cattle on the Grazing Allotments. (*Id.* at 14, 15.) Plaintiff specifically alleges that hunters, allowed onto the Grazing Allotments via permit during hunting season by Defendants, have blocked his cattle's access to the water,

---

[6] At times in the SAC, Plaintiff appears to claim ownership over "springs and stock ponds … within the Grazing Allotments." (Doc. No. 93 at 20.) However, in his Response to the Motions, Plaintiff clarifies that "[t]he SAC is solely concerned with the beneficial use of [his] groundwater rights"—that is, the use of his off-allotment well water once it is transported to the Grazing Allotments. (Doc. No. 110 at 9.)

[7] At times in the SAC, Plaintiff appears to assert an ownership interest in the water improvements themselves, at various times referring to them as "his" water improvements. (Doc. No. 93 at 2, 21, 23.) However, in his Response, Plaintiff clarifies his position, saying that "the use of a possessive pronoun does not alter the substance of the question presented" and that Plaintiff "is simply not challenging the United States' title to any real property in the SAC, as his prayers for relief exclusively address the beneficial use of his groundwater rights." (Doc. No. 110 at 9, 10.) In other words, in his Response, Plaintiff dispels any claims over the water improvements on the Grazing Allotments, and limits his claims to his ability to *use* said water improvements in transporting and storing his groundwater.

causing some cattle to die "for lack of water."[8] (*Id.* at 15.) Further, "hunters and members of the public (acting under license or permission from the USDA-FS and/or the CPW) have … vandalized/destroyed various fences and corrals throughout his Grazing Allotments. The hunters have created new roads throughout the [Grazing Allotments], cut down fences and then used the fence posts for campfires."[9] (*Id.* at 16.) Plaintiff contends that hunters and others have caused him "at least one-million dollars" in "replacement costs." (*Id.*) Plaintiff alleges he "has made proper demand of the USDA-FS [and the Colorado Parks and Wildlife Commission ["CPW"] ] to remedy the current situation, but USDA-FS employees have refused to remedy the situation in any way or cooperate with Plaintiff …. [T]he USDA-FS and CPW officials … have … simply told the Rounds that these grasslands are 'public lands' and the hunters have just as much a right to be there as the Rounds." (*Id*. at 15–16.)

Further, Plaintiff alleges that Defendants have stymied his attempts to take action against hunter activity on the Grazing Allotments personally. Plaintiff alleges that, in early 2020, he "placed 'Keep Out' signs close to his water tanks [on the Grazing Allotments] in an effort to protect not only the lives of his livestock, but also protect his private water rights." (*Id.* at 16.) Plaintiff asserts that "he has the right to protect [his water usage] by placing 'Keep Out' signs on or close to the watering locations." (*Id.*) However, Plaintiff alleges that "[n]ot long after the [he] placed 'Keep Out' signs close to his water tanks, individuals who are … employed by a government agency (either the USDA-FS or the CPW) tore an old windmill brake off the windmill where the sign was placed, and placed the broken handle across the sign." (*Id.*)

---

[8] Plaintiff also contends that "cattle [have] die[d] both from being ran into by hunter's vehicles … [and] young calves have died from dust pneumonia" caused by dust kicked up by hunter's vehicles. (Doc. No. 93 at 15.) However, these allegations are of minimal relevance to whether the existing claims should be dismissed because the existing claims center on water use.

[9] The extent to which these allegations relate to Plaintiff's water usage on the Grazing Allotments is unclear.

### III.   Legal Claims

Based on these allegations, Plaintiff brings claims under the Declaratory Judgment Act, the Fifth Amendment, and the Administrative Procedure Act. 28 U.S.C. §§ 2201–02; U.S. CONST. amend. V; 5 U.S.C. §§701, *et seq*. Plaintiff seeks the following injunctive relief:

A. That this Court order, declare, adjudge, and decree … that Defendants' interference with Plaintiff's valid existing rights is arbitrary, capricious, an abuse of discretion and/or otherwise unlawful; further that said actions taken by the Federal Defendants are contrary to constitutional right, power, privilege or immunity, and/or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

B. That this Court order, declare, adjudge and decree … that the Plaintiff owns groundwater rights that are used within the Grazing Allotments, and that constitute valid existing rights under [The National Forest Management Act].

C. That this Court order, declare, adjudge and decree that the Plaintiff has the right to access his water improvements, including his groundwater wells, springs, stock tanks, stock ponds, water pipelines, and water pipeline roads within the Grazing Allotments; and that he has the right to protect those water improvements from intruders, which includes the right to ensure that his cattle are able to use the stock tanks and stock ponds within the Grazing Allotments without interference.

D. That this Court issue both permanent and temporary injunctive relief, barring the Defendants from interfering with Plaintiff's use of his groundwater rights within the Grazing Allotments, including his access to and protection of the water improvements, which may include the use of "Keep Out" signs around his stock watering locations.

E. That this Court find that when the Defendants disallowed the Plaintiff from protecting his private property rights by posting "Keep Out" signs around his stock watering locations, and when the Defendants allowed hunters to camp and hang out near the stock watering locations, preventing Plaintiff's cattle from watering, these actions constituted an unlawful taking under the Fifth Amendment's Takings Clause.

F. That this Court find that the Forest Service Defendants acted arbitrarily, capriciously, and unreasonably, in violation of the Administrative Procedures (sic) Act.

(Doc. No. 93 at 22–23.)

### IV.   Defendants' Motions

The Federal Defendants contend that "Plaintiff has … repackaged the same allegations" found in the FAC. They argue that because "a QTA suit against the United States remains the exclusive avenue for judicial review of Plaintiff's claims," the court must dismiss the SAC for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). (Doc. No. 100 at 1.) In the alternative, the Federal Defendants argue that even if the QTA is not the exclusive avenue for Plaintiff's allegations, the SAC still fails to "invoke a necessary waiver of sovereign immunity for each count." (*Id.* at 1–2.) The Federal Defendants further claim that even if Plaintiff's claims can be considered on the merits, he has failed to state claims under Rule 12(b)(6). (*Id.* at 4.)

The Colorado Defendants also argue that the QTA is the exclusive avenue for Plaintiff's claims, and the court must therefore dismiss all claims against them. (Doc. No. 101 at 8 n. 3.) The Colorado Defendants also contend that CPW is immune from suit via the Eleventh Amendment.[10] They further argue 1) "this Court lacks jurisdiction over Mr. Round's first cause of action …. [b]ecause Colorado state courts have exclusive jurisdiction to determine the nature and extent of water rights in Colorado," and 2) Plaintiff fails to state a claim against the Colorado Defendants in Count II because he "fails to allege facts demonstrating state action that impaired any cognizable property interest he holds." (*Id.* at 2.)

## LEGAL STANDARD

Federal Rule of Civil Procedure Rule 12(b)(1) empowers a court to dismiss a complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Dismissal under Rule 12(b)(1) is

---

[10] In his Response, Plaintiff agrees with the Colorado Defendants' position, saying, "[i]n light of the [Tenth Circuit's] *Williams* [*v. Utah Dep't of Corr.*] opinion and Round's ability to pursue his takings claim against CPW in state court, he agrees that CPW should be dismissed from this action, but such dismissal should be without prejudice." (Doc. No. 110 at 18–19.) Accordingly, the Court recommends granting the Colorado Defendants' Motion to the extent it applies to CPW. This conclusion, however, does not apply to Defendant Keefer. (*Id.* at 18; Doc. No. 101 at 12.)

not a judgment on the merits of a plaintiff's case. Rather, it calls for a determination that the court lacks authority to adjudicate the matter, attacking the existence of jurisdiction rather than the allegations of the complaint. *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so). The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction. *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974). A court lacking jurisdiction "must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Id.* at 909.

Generally, Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction take two forms. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir.1995), *abrogated on other grounds by Cent. Green Co. v. United States*, 531 U.S. 425, 437 (2001).

> First, a facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint. In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true.
>
> Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends. When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.[11]

---

[11] As noted by Plaintiff, in certain cases, "a court is required to convert a Rule 12(b)(1) motion to dismiss into a … Rule 56 summary judgment motion when resolution of the jurisdictional question is intertwined with the merits of the case." *Holt*, 46 F.3d at 1003. Plaintiff contends that here, "the resolution of the overarching jurisdictional question is intertwined with … Round's takings claim," and thus, the Federal Motion should be considered under Rule 56. (Doc. No 110 at 3.) The Court disagrees. Significantly, the existence of subject matter jurisdiction is not "dependent on the same statute which provides the substantive claim in the case," cutting strongly against Plaintiff's argument. *Id.* at 1003; *see Pringle v. United States*, 208 F.3d 1220, 1223 n. 2 (10th Cir. 2000) ("Certainly, in cases where the jurisdictional issue depends on a statute wholly separate from the statute that provides the substantive claim, it is easy to see that the merits are not intertwined with the jurisdictional issue."). Indeed, in the Court's view,

*Id.* at 1002–03 (citations omitted).

Finally, it is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). This proposition includes federal agencies. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."). "The party bringing suit against the United States bears the burden of proving that sovereign immunity has been waived." *James v. United States*, 970 F.2d 750, 753 (10th Cir. 1992). Likewise, a plaintiff asserting claims against a state official in his official capacity must demonstrate that the suit falls within the *Ex parte Young* exception to Eleventh Amendment sovereign immunity. *Ex parte Young*, 209 U.S. 123 (1908); *Smith v. Plati*, 56 F. Supp. 2d 1195, 1202 (D. Colo. 1999), *aff'd*, 258 F.3d 1167 (10th Cir. 2001).

## ANALYSIS

### I.     Plaintiff's Amended Claims Implicate the Quiet Title Act

As noted by Judge Rodriguez, "the QTA provides a limited waiver of the sovereign immunity of the United States. It permits the United States to be named as a party defendant in a civil action 'to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights.'" (Doc. No. 89 at 8 (quoting 28 U.S.C. § 2409a(a)). "Congress intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' title to real property." *Block v. North Dakota*, 461 U.S. 273, 286 (1983). The QTA cannot "be circumvented by artful pleading." *Id.* at 285 (quoting *Brown v. GSA*, 425 U.S. 820, 833 (1976)).

---

whether the QTA (or Tucker Act) is the exclusive avenue for Plaintiff's takings claim is not significantly linked to the substantive question of whether a taking actually occurred. Accordingly, the Court considers the Motions under Rule 12(b)(1).

Before analyzing whether the QTA is the exclusive mechanism to resolve the SAC's allegations, it is necessary to define the property rights claimed by Plaintiff, carefully. First, it is undisputed that Plaintiff holds groundwater rights to wells on his privately owned land—Well Permit No. 25629 and Well Permit No 287674-A. (Doc. No. 93 at 20.) Second, as Plaintiff's Response makes clear, Plaintiff does not hold, nor does he claim to hold, ownership over any waters originating in the Grazing Allotments.[12] Plaintiff also does not hold, nor claim to hold, title to any water improvement which has been constructed in the Grazing Allotments. (Doc. No. 110 at 9–10.) However, Plaintiff asserts that he has the right to *use* his privately held, off-allotment, groundwater in the Grazing Allotments to support his ranching activities, and further, the right to use the Grazing Allotments' water improvements to transport and store said water in the Grazing Allotments. (*See* Doc. No. 93 at 14.) Plaintiff also claims that Defendants cannot take actions that hamper the use of his off-allotment groundwater or the water improvements on the Grazing Allotments, nor can they take action to prevent him from personally protecting his use of the water improvements to facilitate his groundwater use.[13] (Doc. No. 93 at 14–16.)

---

[12] Due to the QTA's specific exclusion of "water rights" from its ambit, it is worth emphasizing that there is no "disputed title" over water rights in this case. Defendants agree that Plaintiff owns the relevant off-allotment groundwater, while Plaintiff claims no ownership of waters naturally found in the Grazing Allotments. As discussed *infra*, at issue are Plaintiff's alleged rights to use U.S. Forest Service lands, as well as the improvements on those lands, which carry water from his private land onto, and then store water on, the Grazing Allotments.

[13] Though not raised in the SAC, Plaintiff's Response appears to allege a contractual right to use the Grazing Allotments' water improvements. (*See* Doc. No. 110 ("[T]he U.S. Forest Service contractually agreed that the water improvements (and all range improvements) are [Plaintiff's] to use.")). This apparent breach of contract allegation is a previously unmentioned claim and the Court will not consider it here. *See Smith v. Union Pac. R. Co.*, 474 F. App'x 478, 480 (7th Cir. 2012) ("[A plaintiff] may not amend his complaint through the filing of a response brief."). Additionally, as noted by the Federal Defendants, even if the SAC did pursue a breach of contract claim against the Federal Defendants, the Court would likely lack subject matter jurisdiction over the claim. *See Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*, 554 F.3d 1290, 1295–96 (10th Cir. 2009) ("[W]e joined several other circuits in concluding that the Tucker Act impliedly forbids federal courts from ordering declaratory or injunctive relief, at

Though he does not use the term, these allegations appear to describe an easement. An easement "creates a nonpossessory [property] right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement." 1 Restatement (Third) of Property: Servitudes § 1.2(1). That is precisely what Plaintiff desires here—a right to use federally-owned land and improvements without interference. *Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1234 (Colo. 1998), *as modified on denial of reh'g* (Oct. 19, 1998) ("An easement is a right … authorizing one to do or maintain something on the land of another 'which, although a benefit to the land of the former, may be a burden on the land of the latter.'" (quoting *Barnard v. Gaumer*, 361 P.2d 778, 780 (Colo. 1961))); *Wright v. Horse Creek Ranches*, 697 P.2d 384, 387 (Colo. 1985) (stating that an easement confers upon the holder an enforceable right to use the property of another for specific purposes); *see also City and County of Denver v. Bergland*, 695 F.2d 465 (10th Cir. 1982) (holding that, although a water decree prohibited the U.S. Forest Service from challenging Denver's right to appropriate certain waters, it had no effect on the agency's ability to regulate Denver's use of U.S. Forest Service lands in diverting and utilizing the water when the City's plans exceeded the easement it had been granted in 1924).[14]

---

least in the form of specific performance, for contract claims against the government, and that the APA does not waive sovereign immunity for such claims." (internal alterations and quotations omitted)). And while the Court takes no position on it, the merits of a contractual claim grounded in the Grazing Agreement appear tenuous. *See, e.g., Osborne v. United States*, 145 F.2d 892, 896 (9th Cir. 1944) ("It is safe to say that it has always been the intention and policy of the government to regard the use of its public lands for stock grazing … under regulation through the permit system, as a privilege which is withdrawable at any time for any use by the sovereign without the payment of compensation."); *Hage v. United States*, 35 Fed. Cl. 147, 166 (1996) ("[T]he court concludes that as a matter of law the [grazing] permit does not create a contract between the parties.").

[14] A water right is separate from a right to burden lands owned by another in order to use one's water. As pointed out by the Federal Defendants, there is substantial case law noting this distinction. *See, e.g., Snyder v. Colorado Gold Dredging Co.*, 181 F. 62, 69 (8th Cir. 1910) ("The

Plaintiff argues against the notion of an easement because he "is simply not challenging the United States' title to any real property in the SAC, as his prayers for relief exclusively address the beneficial use of his groundwater rights." (Doc. No. 110 at 10.) However, the allegations in the SAC betray Plaintiff's arguments. The SAC concerns his groundwater rights, but the allegations are centered on his ability to use that water *on federal land* without any limitations by the Federal Defendants or intrusion by the public. (Doc. No. 93 at 22–23.) Although Plaintiff attempts to reframe this as a case about the taking of water rights, unrelated to any property title dispute, the crux of his SAC continues to be about the rights Plaintiff can or cannot exercise over and on *federal land*. At its core, the SAC continues to describe a property right, if not in the land itself, in an easement on the land.

A District Court in Nevada recently considered a case involving somewhat similar circumstances. In *Baker Ranches, Inc. v. Zinke*, two sets of plaintiffs held water rights to certain waters that originated in, and flowed out of, Great Basin National Park. 2022 WL 4017059, at *1– 4 (D. Nev. Sept. 1, 2022). The first set of plaintiffs—landowners just outside the park boundary—held rights to waters originating in a stream running through the park called Snake Creek. *Id.* at *3. The second set of plaintiffs, also owners of land just outside the park boundary, held rights to water originating in the park and flowing in a stream known as Baker Creek. *Id.* In 1963, the U.S. Forest Service allowed the private construction of a three-mile concrete pipeline on federal lands where water had been "seeping into the ground as it flowed downstream," such that more water would flow to the Snake Creek plaintiffs. *Id.* at *2. Then, "[b]eginning in 2016,

---

right to appropriate the waters of a stream does not carry with it the right to burden the lands of another with a ditch for the purpose of diverting the waters and carrying them to the place of intended use …."); *Utah Power & Light Co.*, 243 U.S. 389, 411 (1917) ("This is not a controversy over water rights but over rights of way through lands of the United States, which is a different matter and is so treated in the right-of-way acts before mentioned.") *Hage v. United States*, 51 Fed. Cl. 570 (Fed. Cl. 2002) (distinguishing between water rights and ditch rights-of-way).

water began leaking from the Pipeline," impacting the flow of water available to the Snake Creek plaintiffs. *Id.* Meanwhile, the Baker Creek plaintiffs alleged that "members of the public [had] created obstructions and man-made dams within" the park, reducing the amount of water flowing to them as well. *Id.* at 2–3. Both sets of plaintiffs brought suit after the federal government declined to allow the Snake Creek plaintiffs to fix and maintain their pipeline, or the Baker Creek plaintiffs to clear the public-made obstructions in the creek. *Id.* at 3, 4. In that case, the property rights at issue were "vested rights-of-way or easements within the Park." *Id.* at *6; *see id.* at *14 (stating the court must determine whether the Snake Creek plaintiffs own an "easement within the Park that would permit them to maintain and repair the water conveyance"); *id.* at *21 ("The Baker Creek Plaintiffs argue that they have a right-of-way or easement to Baker Creek, and that the Government is interfering with their vested right when it prevents them from removing debris or obstructions from the creek.") In other words, the Sand Creek and Bear Creek plaintiffs' desire to maintain access to their water without interference, was construed as claim to an easement on federal land.

To be sure, *Baker Ranches* is not identical to this case. Most notably, while this case involves Plaintiff's right to transport and store his water *on* federal lands, *Baker Ranches* involved the plaintiffs' ability to maintain water flows coming *off* federal lands. Still, the cases have this in common: a claimant(s) that seeks to be free from interference when it comes to maintaining water located on federal lands. And, to the extent the *Baker Ranches* court and the *Baker Ranches* parties agreed their claim should be construed as a claim to an easement, the Court finds that construction persuasive.

Moreover, Plaintiff's claims cannot be adjudicated without a threshold determination as to whether he holds an easement over the Grazing Allotments. First, a declaration that Plaintiff

has the right to access, protect, and exclude others from the off-allotment water he brings onto the Grazing Allotments, is directly tied to the question of whether he holds an easement because he would have no right to exclude others without an exclusive right to access. 1 Restatement (Third) of Property: Servitudes § 1.2(1) (stating an easement grants the "right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement"). Second, whether or not Defendants' actions constitute a taking is predicated on Plaintiff having some property interest in the Grazing Allotments—which Defendants dispute. *Wright*, 697 P.2d at 387. Thus, and as noted above, Plaintiff's claims continue to be centered on alleged property rights in the Grazing Allotments—albeit property rights that amount to less than fee-simple ownership.

The question then becomes whether the QTA provides the exclusive avenue for suit when a plaintiff makes a claim, adverse to the United States, for a property right less than fee-simple ownership. It does. *See McKay v. United States*, 516 F.3d 848, 850 (10th Cir. 2008) ("[A]s its legislative history makes clear, the QTA applies even where the plaintiff claims an estate less than a fee simple such as an easement." (quoting *Kinscherff v. United States*, 586 F.2d 159, 161 (10th Cir. 1978)) (internal quotation marks and alterations omitted)); *see* H.R.Rep. No. 92–1559 (1972) ("The quieting of title where the plaintiff claims an estate less than a fee simple—an easement or the title to minerals—is likewise included in the terms of the proposed statute."); *see also Baker Ranches, Inc.* 2022 WL 4017059 at *5 ("Plaintiffs' first claim seeks to quiet title under the Quiet Title Act, 28 U.S.C. §§ 1346(f) and 2409a, for a recognized right-of-way or easement …in order to protect [p]laintiffs' rights to appropriate water from Snake Creek … and Baker Creek [through National Park Service land]."). The Court therefore agrees with Defendants that the QTA bars Plaintiff's claims, and the SAC must therefore be dismissed.

## II.     Plaintiff's Claims Fail Even If the QTA Does Not Apply

Even assuming the QTA does not apply, the court lacks subject matter jurisdiction over the claims in the SAC. First, the court does not have subject matter jurisdiction over water right claims, and the Declaratory Judgment Act does not operate as a waiver to sovereign immunity. Second, Plaintiff's takings claims must be brought in Federal Claims Court, not this court. And finally, Plaintiff's Administrative Procedure Act ["APA"] claim fails because Plaintiff has not identified a final agency action.

### A.  The Declaratory Judgment Act does not waive federal sovereign immunity or interfere with exclusive state jurisdiction over water rights decrees.

In his first cause of action, Plaintiff seeks declarations under 28 U.S.C. §§ 2201–02 that Plaintiff owns "valid existing rights" to use his groundwater in the Grazing Allotments, that "Plaintiff has the right to access [the Grazing Allotment's] water improvements … and … to protect those water improvements from intruders," and that Defendants are barred from interfering with these rights. (Doc. No. 93 at 22–23.) The court does not have subject matter jurisdiction over this cause of action.

First, to the extent Plaintiff contends his groundwater well permits include the right to use that water on the Grazing Allotments without interference, the court lacks jurisdiction to make such a declaration. In Colorado, "[w]ater courts retain exclusive jurisdiction over all water matters." *In re Tonko*, 154 P.3d 397, 404 (Colo. 2007). This includes decrees regarding the nature and extent of a water right, such as the ability to use water in certain ways or places without interference. In *Kobobel v. State, Department of Natural Resources*, the Colorado Supreme Court explained that "actions to determine the use of water belong exclusively in the [state] water courts." 249 P.3d 1127, 1132 (Colo. 2011). Accordingly, "[w]hen a plaintiff's claims ultimately rest on the scope of their right to use their decreed water rights, …. [s]uch a

determination is a water matter that falls uniquely within the jurisdiction of the water court." *Id.* at 1332–33.

Here, though it is undisputed that Plaintiff holds decreed water rights in the form of two groundwater wells, he does not point to any prior decree setting out a legal right to use that water in a particular way. Without such a decree from the Colorado water courts, the court cannot declare that Plaintiff has a right to use his well water in the Grazing Allotments without interference. *See id.* ("[I]t is undisputed that the well owners owned several decreed wells …. [However,] before the well owners would be entitled to a jury determination of just compensation for the taking of their property, they must first establish that a taking occurred …. [T]he nature of the claim and relief sought here requires a [Colorado water] court to determine whether the well owners had the right to *use* water from their wells without State interference." (emphasis in original)).[15]

**B. The court lacks subject matter jurisdiction over Plaintiff's takings claim.**

Plaintiff's second cause of action seeks a declaration that Defendants' allowance of hunters on the Grazing Allotments, and further, their interference with Plaintiff's attempt to protect his water and the water improvements from said hunters, constitutes a Fifth Amendment taking.

---

[15] To the extent Plaintiff seeks a declaratory judgment that he has property rights in the water *improvements* on the Grazing Allotments, the court still does not have subject matter jurisdiction over that claim. If the improvements are treated as property that is not part of any water dispute, the QTA is the exclusive means to challenge title. *See infra* at 10; 36 C.F.R. § 222.9(a)-(b) (authorizing the Forest Service to permit "individuals, organizations or agencies" "to install and maintain structural and nonstructural range improvements needed to manage the range resource on National Forest System lands and other lands controlled by the Forest Service" but clarifying that title to these improvements "shall rest in the United States"). If, on the other hand, the improvements are not separate property, but rather part and parcel of a dispute over water rights, that dispute must be adjudicated in Colorado's water courts as discussed in *Kobobel*, 249 P.3d at 1131 ("The well owners' takings claims center on the right to use water, and therefore are water matters within the exclusive jurisdiction of the water court.").

The Takings Clause prohibits the government from taking private property "for public use, without just compensation." U.S. Const. amend. V. "The Fifth Amendment does not prohibit the government from taking its citizens' property; it merely prohibits the government from taking property without paying just compensation." *Miller v. Campbell Cty.*, 945 F.2d 348, 352 (10th Cir. 1991) (citation omitted) *abrogated in part on other grounds by Knick v. Twp. of Scott, Pa.*, 139 S. Ct. 2162, 2179 (2019). If the government has provided an adequate process for obtaining compensation, a plaintiff suing under the Takings Clause must first exhaust his remedies under that process before filing suit in federal court. *See Horne v. Dep't of Agric.*, 569 U.S. 513, 525 (2013).

The Tucker Act provides a limited waiver of sovereign immunity for monetary suits seeking more than $10,000, when such suits are brought in the Court of Federal Claims. 28 U.S.C. § 1491(a)(1). This limited waiver of sovereign immunity applies to suits brought under the Constitution, such as a Fifth Amendment takings case. *Preseault v. I.C.C.*, 494 U.S. 1, 17 (1990) (finding that "a Tucker Act remedy is available for claims arising out of takings pursuant to the Amendments"). Because the Court of Federal Claims has exclusive jurisdiction over Tucker Act claims, and given that "just compensation" refers to monetary remuneration, "a claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance." *Eastern Enterprises v. Apfel*, 524 U.S. 498, 520 (1998).

Here, the SAC refers to $1,000,000 in "replacement costs" (Doc. No. 93 at 16), but Plaintiff does not request monetary compensation in connection with his takings claim. (*Id.* at 22–23; *see* Doc. No. 110 (stating Plaintiff "seeks relief other than money damages" (internal quotation marks omitted)).) Nevertheless, Plaintiff alleges a "classical taking," by which the government has allegedly taken physical property rights—namely, the right to use his water and

the Grazing Allotments' water improvements without interference. There is no question that, if proven, Plaintiff would have an adequate monetary remedy under the Tucker Act, and in fact, Plaintiff has alleged that his harm can be monetarily quantified. *See S. Spanish Trail, LLC v. Globenet Cabos Submarinos Am., Inc.,* No. 19-80240-CIV, 2019 WL 3285533, at *5 (S.D. Fla. July 22, 2019) ("[I]n classical takings, the law is pellucid: before bringing suit in federal district court, a party must first seek 'just compensation' in the Court of Federal Claims.").

Plaintiff contends, however, that the court has jurisdiction over any takings claim which only seeks prospective, and not monetary, relief. Plaintiff relies on *Eastern Enterprises v. Apfel*, noting that a plurality of the Supreme Court found "it is within the district courts' power to award [ ] equitable relief" in a takings case. 524 U.S. 498, 522 (1998). But Plaintiff's argument glosses over the fact that in *Eastern Enterprises*, "it [could not] be said that monetary relief against the Government [was] an available remedy." *Id.* at 521; *see id.* at 516–19 (explaining that the plaintiff challenged the Coal Industry Retiree Health Benefit Act of 1992, which required it to pay over $5 million per year into a private fund for former coal workers, as an unconstitutional regulatory taking). In other words, the reason the *Eastern Enterprises* takings claim did not fall within the ambit of the Tucker Act, was because a compensatory remedy was not available in that case. *Id.* at 521–22 (collecting cases); *see id.* at 521 ("[T]he presumption of Tucker Act availability must be reversed where the challenged statute, *rather than burdening real or physical property*, requires a direct transfer of funds mandated by the Government." (emphasis added)). Indeed, the *Eastern Enterprises* court found that but for the lack of an available monetary remedy, "[Supreme Court] precedent can be read to support the … conclusion that *regardless of the nature of relief sought*, the availability of a Tucker Act remedy renders premature any takings claim in federal district court." *Id.* (emphasis added); *see Gordon v.*

*Norton*, 322 F.3d 1213, 1218 (10th Cir. 2003) ("Plaintiffs allege takings of physical property ....

[t]he plurality in *Eastern Enterprises* distinguished takings of physical property and recognized

that a Tucker Act remedy is available for such takings. Accordingly, there is no reason to reverse

the presumption of Tucker Act applicability to plaintiffs' takings claims for the loss of physical

property."); *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1019 (1984) (finding that

when "an adequate remedy for the taking exists under the Tucker Act, [t]he District Court erred

in enjoining the taking").

This case is not like *Eastern Enterprises*. Here, Plaintiff does not request monetary relief,

but monetary relief is theoretically available for the very claims Plaintiff lodges against the

government. Accordingly, a takings claim would need to be filed in the Court of Federal Claims,

and the court does not have subject matter jurisdiction.[16] [17]

---

[16] This analysis stands when considering the waiver of federal sovereign immunity provided by 5 U.S.C. § 702. *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action ... within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States .... *Provided* ... Nothing herein (2) confers authority to grant relief if any other statute that grants consent to suit expressly or *impliedly forbids* the relief which is sought." (emphasis added)). The Tucker Act provides exclusive jurisdiction for takings claims which are compensable. It would be illogical (and perhaps "impliedly forbid[den]") to allow a plaintiff to circumvent the Tucker Act simply by bringing a suit for equitable relief against a federal agency or agency employee. *Cf. Egbert v. Boule*, 142 S. Ct. 1793, 1804 (2022) ("[O]ur cases hold that a court may not fashion a ... remedy if Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure." (citation and quotation marks omitted)); *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1082 (10th Cir. 2006) ("We now join our fellow circuits in holding that the Tucker and Little Tucker Acts "impliedly forbid" federal courts from ordering declaratory or injunctive relief, at least in the form of specific performance, for contract claims against the government, and that the APA thus does not waive sovereign immunity for such claims.").

[17] To the extent Plaintiff brings a takings claim against the State Defendants, a similar analysis applies. In the recent case of *Knick v. Township of Scott, Pennsylvania*, the Supreme Court held that a plaintiff may bring a takings claim in federal court, without exhausting state court remedies, under 42 U.S.C. § 1983. 139 S. Ct. 2162, 2179 (2019). However, the Court notes that

### C. Plaintiff does not identify a final agency action.

Plaintiff's third cause of action seeks a declaration that the Federal Defendants acted arbitrarily and capriciously in declining to remediate damages caused by hunters on the Grazing Allotments and in obstructing Plaintiff's attempt to protect the water improvements from hunters personally. (Doc. No. 93 at 22–23.)

The APA waives United States sovereign immunity and authorizes judicial review of "final agency action for which there is no other adequate remedy in a court." *Kansas, ex rel. Schmidt v. Zinke*, 861 F.3d 1024, 1028 (10th Cir. 2017); 5 U.S.C. § 704; *see McKeen v. U.S. Forest Serv.*, 615 F.3d 1244, 1253 (10th Cir. 2010) ("Pursuant to the APA, we have jurisdiction to review only final agency action.") (internal quotation marks omitted). The APA defines "agency action" as an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). "[T]wo conditions must be satisfied for agency action to be 'final.'" *Bennett v. Spear*, 520 U.S. 154, 177 (1997). First, the action must "mark the consummation of the decisionmaking process." *Id.* at 177–78. Second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow." *Id.* at 178. A Plaintiff "bears the burden of demonstrating that the agency action challenged … is final." *Miami Tribe of Oklahoma v. United States*, 198 F. App'x 686, 690 (10th Cir. 2006).

---

in *Knick*'s dicta, the Supreme Court repeatedly emphasized that "[state and local] [g]overnments need not fear that our holding will lead federal courts to invalidate their regulations as unconstitutional. As long as just compensation remedies are available—as they have been for nearly 150 years—injunctive relief will be foreclosed." *Id.*; *see id.* at 2176 ("Today, because the federal and nearly all state governments provide just compensation remedies to property owners who have suffered a taking, equitable relief is generally unavailable. As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin government action effecting a taking.").

Here, in an attempt to demonstrate final agency action, Plaintiff points to several letters he sent to the Federal Defendants prior to bringing this suit. First, on September 20, 2019, Plaintiff wrote a letter to Defendant Trujillo, "assert[ing] several concerns regarding abuses of his private property rights, including that his water rights have been interfered with by USDA-FS employees in various ways." (Doc. No. 93 at 17–18, Ex. 1.) On November 14, 2019, Defendant Trujillo responded by informing Plaintiff that the Grazing Allotments are "open to public access" and that he "may not erect signs of fencing … to prevent public access to federal land" without authorization. (*Id.*, Ex. 2 (citing several statutory and regulatory provisions).) On January 7, 2020, Plaintiff "appeal[ed]" Defendant Trujillo's "decision" by sending letters to "the Acting Regional Forester for the Rocky Mountain Region and the Chief of the USDA-FS," positions now held by Defendants Beum and Moore. (*Id.* at 18, Ex. 3.) After receiving no response to that letter, on March 7, 2020, Plaintiff "sent a letter … to the Chief of the USDAFS and the U.S. Secretary of Agriculture," positions now held by Defendants Moore and Vilsack, "appealing Defendant Trujillo's decision, and appealing the inaction of her direct supervisors." (*Id.* at 18, Ex. 4.) Shortly after sending the third letter, on April 1, 2020, Plaintiff received a response from the Acting Regional Forester for the Rocky Mountain Region that reiterated Defendant Trujillo's initial response. (*Id.* Ex. 5.) Unsatisfied with this response, on May 18, 2020, Plaintiff "sent another letter … to the Chief of the USDA-FS and the U.S. Secretary of Agriculture, appealing the decisions of Defendant Trujillo and the Regional Forester." (*Id.* Ex, 6.) Plaintiff received no response to his final letter. (*Id.*)

Plaintiff contends that the Federal Defendants' responses (and lack of responses) constituted "final agency action" under § 704. The Court disagrees. At best, Plaintiff references a "decision" from Defendant Trujillo, but Defendant Trujillo's response to Plaintiff simply

clarified and/or reiterated long-standing U.S. Forest Service policy regarding public access to Forest Service lands. *See Cherry v. U.S. Dep't of Ag.*, 13 F. App'x 886, 891 (10th Cir. 2001) (holding that the implementation of "decisions [that] were made long ago" was not a final agency act). Accordingly, it cannot be said that her response or any other response to Plaintiff's letters "mark[s] the consummation of the decisionmaking process" nor that "rights or obligations have been determined," and "legal consequences will flow" from that. *Bennett*, 520 U.S. at 177–78. In other words, a simple explanation of long-standing rights and obligations—like the explanation about open public access that Defendant Trujillo provided here—does not constitute challengeable action.[18] *See Montana Snowmobile Ass'n v. Wildes*, 103 F. Supp. 2d 1239, 1242 (D. Mont. 2000), *aff'd*, 26 F. App'x 762 (9th Cir. 2002) (explaining that the "adoption of the Forest Plan … [in] 1986 … constituted the final agency action on motorized use" on the lands at issue, but the 1998 letter "restating the Forest Plan determination that [the lands in question] were closed to motorized use because the 1986 Forest Plan specifically banned such use" did not); *see also Kansas ex rel. Schmidt*, 861 F.3d at 1034 (affirming dismissal for lack of subject matter jurisdiction where an opinion letter did not constitute final agency action); *Cheyenne-Arapaho Gaming Comm'n v. Nat'l Indian Gaming Comm'n*, 214 F. Supp. 2d 1155, 1169 (N.D. Okla. 2002) ("The Court finds that the advisory opinion letter is not considered a final agency action."). Accordingly, the court lacks subject matter jurisdiction to hear Plaintiff's APA claim.

## CONCLUSION

---

[18] As pointed out by the Federal Defendants, Plaintiff may apply for a "special use permit" to erect fencing or other barriers on U.S. Forest Service land. (Doc. No. 100, 17); 36 C.F.R. § 261.10. A denial of such an application may constitute a "final agency action," but there is no indication Plaintiff applied for such a permit.

For the foregoing reasons, the Court **RECOMMENDS** that the Federal Defendants' Motion to Dismiss (Doc. No. 100) and the Colorado Defendants' Motion to Dismiss (Doc. No. 101) be **GRANTED**, and that Plaintiff's Second Amended Complaint (Doc. No. 93) be **DISMISSED without prejudice**.[19]

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. ‘ 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop.*

---

[19] To the extent their motion is granted based on the QTA, the Federal Defendants contend the SAC should be dismissed with prejudice because Plaintiff's property claim is time-barred. (Doc. No. 115 at 6.) A QTA action "shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States." 28 U.S.C.A. § 2409a(g). Here, the Court finds it unclear when Plaintiff knew or should have known the government took a position adverse to Plaintiff's purported easement. In contrast to his FAC claim of fee simple ownership over the Grazing Allotments, an easement would not be inconsistent with U.S. ownership, making it more difficult to determine the moment at which the statute of limitations clock began ticking. *See Michel v. United States*, 65 F.3d 130, 131–32 (9th Cir. 1995) ("[T]he Michels' knowledge of the government's claim of title was not itself sufficient to trigger the running of the limitations period on their claim of a right to use roads and trails across the refuge.… If a claimant asserts fee title to disputed property, notice of a government claim that creates even a cloud on that title may be sufficient to trigger the limitations period. But when the plaintiff claims a non-possessory interest such as an easement, knowledge of a government claim of ownership may be entirely consistent with a plaintiff's claim. A plaintiff's cause of action for an easement across government land only accrues when the government, adversely to the interests of plaintiffs, denies or limits the use of the roadway for access to plaintiffs' property." (internal citations, quotations, and alterations omitted)). Moreover, the parties' briefing does not adequately address the QTA statute of limitations issue. For these reasons, the Court recommends dismissal without prejudice.

*Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); *but see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

        Dated this 28th day of February, 2023.

                        **BY THE COURT:**

                        Maritza Dominguez Braswell
                        United States Magistrate Judge